UMHOFER, MITCHELL & KING LLP
Matthew Donald Umhofer (SBN 206607)
Adam Snyder (SBN 312160)
767 S. Alameda St., Suite 270
Los Angeles, California 90021
Telephone: (213) 394-7979
Facsimile: (213) 529-1027
matthew@umklaw.com
adam@umklaw.com

*Attorneys for Plaintiff Amnon Edri, individually and as Trustee of The Edri Family Trust*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

AMNON EDRI, individually and as Trustee of The Edri Family Trust,

Plaintiff,

v.

DANIEL AHARONOFF, an individual,

Defendant.

Case No. 2:26-cv-13750

**COMPLAINT FOR:**

1. **BREACH OF FIDUCIARY DUTY**
2. **FRAUD AND DECEIT—INTENTIONAL MISREPRESENTATION AND CONCEALMENT**
3. **CONSTRUCTIVE FRAUD**
4. **NEGLIGENT MISREPRESENTATION**
5. **VIOLATION OF SECURITIES EXCHANGE ACT § 10(b) AND RULE 10b-5**
6. **RESCISSION UNDER SECURITIES EXCHANGE ACT § 29(b) FOR VIOLATION OF § 15(a)**
7. **NEGLIGENCE AND NEGLIGENCE PER SE**
8. **BREACH OF WRITTEN CONTRACT AND OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**
9. **VIOLATION OF BUSINESS AND PROFESSIONS CODE § 17200**

**DEMAND FOR JURY TRIAL**

## PRELIMINARY STATEMENT

1. Plaintiff Amnon Edri ("Edri"), individually and as trustee of The Edri Family Trust, brings this action under the Securities Exchange Act of 1934 and California law against Daniel Aharonoff ("Aharonoff"), a self-described "prominent technology investor" who, for a promised 25% share of the profits, persuaded Edri—a friend from his synagogue and a contractor who had never owned a single cryptocurrency—to put more than $360,000 into one crypto token that Aharonoff chose, sized, and timed, and whose defining feature he never mentioned: it was a leveraged derivative, and its own developers had warned that holding it "over an extended period of time" was "a very high risk strategy."

2. The token, ETH2x-FLI, is engineered to deliver twice the daily price movement of Ethereum ("ETH") by borrowing against its holders' collateral and rebalancing daily. In a falling or volatile market, that mechanism sells collateral low and buys it high, and the token's value decays whether or not Ethereum recovers. The developers have since told holders of its successor to manage positions in "daily or weekly terms, not monthly or yearly terms."

3. Aharonoff told Edri the opposite. His written terms promised that every strategy would "provide liquidity in order to exit to cash at any time" and that "[n]o strategies will lock any funds long terms." He told Edri that the position was "a long term not short term trade," that each drawdown was "irrelevant," "par for the course," and "expected and normal," and—as late as June 2024—to "stay in position." The word "leverage" does not appear in five years of his messages.

4. Edri did what he was told. Between August 2021 and January 2022, he bought 1,871.08 ETH2x-FLI tokens with $361,349.38, most of it within weeks of the top of the market, and then held them. Those tokens are now worth less than $10,000. The loss is not the market's doing: in August 2025, Ethereum set a new all-time high, above its price on the day of every one of Edri's purchases, and the position was still down roughly 90%. That gap is the leverage decay Aharonoff never disclosed.

5. Aharonoff was never licensed as an investment adviser or registered as a broker. He was nonetheless in the business: while advising Edri, he was circulating a confidential investor deck for "Alef 10X LLC," of which he was "Managing Partner," with a "Minimum LP Investment" of $500,000 and a "Target IRR" of "50%+," and he told Edri that he was "reaching my $10M max goal pretty quickly."

6. Edri seeks rescission, compensatory and punitive damages, prejudgment interest, enhanced damages and attorney's fees under California Code of Civil Procedure section 1029.8, and an injunction barring Aharonoff from continuing to advise others for compensation without a license.

**PARTIES**

7. Plaintiff Amnon Edri is an individual residing in Encino, Los Angeles County, California. Edri owns and operates a residential construction and home-improvement business. Before August 2021, Edri had never purchased or held any cryptocurrency or other digital asset and had never used a decentralized-finance ("DeFi") application.

8. Edri brings this action individually and as trustee of The Edri Family Trust (the "Trust"), an express trust of which Edri is a trustee. See Fed. R. Civ. P. 17(a)(1)(E). Of the funds at issue, $251,349.38 was transferred from a savings account held by the Trust, and the balance was transferred from accounts held by Edri individually.

9. Defendant Daniel Aharonoff is an individual residing in Encino, Los Angeles County, California.

10. Aharonoff describes himself publicly as a "visionary investor," a "prominent technology investor," and a "seasoned technology entrepreneur." He is the principal of a business he calls BroadScaler Enterprises. In 2021 he held himself out as "Managing Partner" of "Alef 10X LLC," which he described as a "DeFi Arbitrage Platform" offering outside investors "Partnership Agreement (GP/LP)" interests.

11. Aharonoff is not, and at no time relevant to this action was, registered with the United States Securities and Exchange Commission (the "SEC") as a broker, dealer,

or investment adviser. He is not, and was not, associated with any registered broker-dealer. He has never applied for or obtained a certificate from the Commissioner of the California Department of Financial Protection and Innovation authorizing him to act as a broker-dealer under California Corporations Code section 25210 or as an investment adviser under California Corporations Code section 25230.

12. Aharonoff was not exempt from those registration and licensing requirements.

## JURISDICTION AND VENUE

13. This action arises under Sections 10(b), 15(a), and 29(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78o(a), and 78cc(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. This Court has subject-matter jurisdiction over those claims under 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa(a).

14. This Court has supplemental jurisdiction over Edri's claims under California law pursuant to 28 U.S.C. § 1367(a). Those claims arise from the same transactions and occurrences as the federal claims—Aharonoff's solicitation of Edri, the terms under which Aharonoff undertook to manage and advise on Edri's investment, Aharonoff's statements and instructions, and the purchases of ETH2x-FLI tokens that followed—and form part of the same case or controversy.

15. Aharonoff is domiciled in California and resides in Encino, Los Angeles County, California. This Court has personal jurisdiction over him, and process may be served on him wherever he may be found. 15 U.S.C. § 78aa(a).

16. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (2) and 15 U.S.C. § 78aa(a). Aharonoff resides in this District. He solicited Edri in person in Los Angeles County. The January 19, 2022 transactions described below were carried out at Aharonoff's home in Encino. The funds at issue were transferred from Edri's bank accounts in Los Angeles County.

17. A substantial part of the events giving rise to Edri's claims occurred in Los Angeles County, and this action is properly assigned to the Western Division of this Court.

18. In connection with the conduct alleged in this Complaint, Aharonoff, directly and indirectly, used the means and instrumentalities of interstate commerce, including electronic mail; messages sent over the internet through the WhatsApp messaging application; telephone calls; wire and ACH transfers through Wells Fargo Bank, First Republic Bank, and Silvergate Bank; the Dharma and Coinbase platforms; and transfers of USDC, ETH, and ETH2x-FLI tokens recorded on the Ethereum blockchain.

## FACTUAL ALLEGATIONS

### A. Edri and Aharonoff

19. Edri and Aharonoff were friends for years before 2021. They attended the same synagogue in the San Fernando Valley, and in early 2021 Edri arranged for his contractors to repair, and later to paint, the gates at Aharonoff's home.

20. Aharonoff cultivated a public reputation as an expert technology and digital-asset investor. He published blogs under the names "AharonoffTechTales" and "I'm Digital Dan" and on Medium, with titles such as "Ethereum's Supercycle: The Future of Finance"; hosted podcasts, including "Daniel Aharonoff Presents 10 Reasons why Ethereum Will Change the World"; maintained an IMDb biography and a Crunchbase profile describing him as "a seasoned technology entrepreneur and investor with over 25 years of experience"; and was the subject of a NASDAQ press release describing him as "a prominent technology investor."

21. Edri knew of Aharonoff's reputation as an investor and technologist and trusted it.

### B. Aharonoff's Investment Business

22. On September 1, 2021, Aharonoff sent Edri a twelve-page document marked "CONFIDENTIAL," bearing the title "ALEF 10X" and the subtitles "Web 3

Informational" and "Defi Arbitrage Opportunity" (the "Deck"), with the message: "See attached the private deck you can share with your friend." The Deck identified Aharonoff as "Managing Partner" of Alef 10X LLC and described him as "a serial entrepreneur" who had held "senior roles at some of the world's largest and iconic digital media and banking companies, including but not limited to 7-Eleven, Seven Bank, NBC, Fox Kids."

23. The Deck offered outside investors a "Partnership Agreement (GP/LP)" with a "Minimum LP Investment: $500K," a "Target IRR: 50%+," a "Minimum Hurdle Rate: 25%," and a "GP/LP Split: 50/50 above Hurdle Rate." It described the business as providing "ACTIVELY MANAGED EXPOSURE TO WIDELY TRADED LIQUID CRYPTO ASSETS" through staking, lending, market making, and special situations, with "No Lock Up Period" and "24/7, Real Time Access to Positions/Trades."

24. The Deck listed among its risk factors the "Reclassification of cryptos as securities or 'investment contracts' on Federal and/or State (CA) levels." Aharonoff thus understood that the digital assets he was recommending could be securities.

25. Aharonoff was soliciting other investors at the same time he solicited Edri. On August 12, 2021, he told Edri that he had "4 coming in" and that he was "going to finalize things with a few investors by next week." On September 1, 2021, he told Edri, "I'm going to limit to 10 partnership agreements." On September 30, 2021, he wrote: "I'm increasing the minimum to $1M for anyone new that wants to come in. Does your money guy want to talk? I'm reaching my $10M max goal pretty quickly."

26. Aharonoff told Edri that the terms he was extending to Edri were different from those offered to Deck investors and were "purely for limited friends and family," and he asked Edri not to share them.

27. In April 2026, Aharonoff described the advice he had given Edri as "friendly advise which I've given many friends and family."

**C. The Solicitation and the August 13, 2021 Terms**

28. On August 7, 2021, Aharonoff messaged Edri on WhatsApp: "Shavua tov Amnon. I finally have an opportunity in blockchain for your to participate in. If you are still interested we should talk tmw, Sunday."

29. On August 12, 2021, Aharonoff instructed Edri to "go to dharma.io and install their app and get verified and have the the wire instructions," told him that "seems I have 4 coming in so next I'll send basic terms via email to sign off on," and added: "I also have revised my terms which are more in your favor." Dharma was a mobile application, operated by Dharma Labs, Inc., through which a user could convert dollars to digital assets and hold them in a wallet on the Ethereum blockchain.

30. On August 13, 2021, Aharonoff emailed Edri a document under the subject line "Private DeFi Terms" (the "Terms"). Aharonoff described the Terms as "a recap of what we discussed" that "should in basic terms explain clearly what we are both agreeing to," and asked Edri to "respond that the above accurately represents what we discussed." Minutes later he messaged Edri: "Just sent you the email recap please reply you agree if all is as we discussed, which it should." A true and correct copy of the Terms and the email exchange that followed is attached as Exhibit A.

31. In the Terms, Aharonoff undertook to manage Edri's investment. He wrote: "The goal is to scale the investment by applying defi protocol strategies discussed and the basic understanding is that I'll log into your account and manage that and or at times need to move funds to another wallet to complete a transaction and then move back to your own wallet which you have full control over." He added that "[b]oth of us will have access to the wallet so you have full transparency on account value."

32. The Terms made two representations about the character of the strategies Aharonoff would apply: "All strategies I apply will provide liquidity in order to exit to cash at any time," and "No strategies will lock any funds long terms."

33. The Terms required secrecy: "You agree to keep our private conversations private and keep any strategies private as well and not discuss or share with anyone else."

They also provided that Edri could add or remove funds "at any time as long as we discuss first."

34. The Terms fixed Aharonoff's compensation. Edri was to pay "a quarterly 25% performance fee on any profits generated based on any money deployed," distributed to Aharonoff's wallet "in the native token assets that are being managed," and Aharonoff asked that "5% of your profits be gifted to the charity of my choice." Aharonoff bore no share of any loss: "any losses are fully absorbed by you and I am not responsible for recovering those losses."

35. The only risks the Terms identified were "outcomes that are out of my control such as market timing, world catastrophe, unforeseen changes, 3rd party risk, hacks, etc." Aharonoff added: "Having said that, I'm long and the upside outweighs the downside."

36. The Terms said nothing about leverage, borrowing, rebalancing, volatility decay, derivative tokens, or concentrating the entire investment in a single product.

37. On August 15, 2021, Edri replied by email that the Terms were "all correct and matching with our phone discussions," reserving only "a say" over the charitable gift, and said that he was "pretty much ready to go next week." On August 16, Aharonoff answered: "Sounds good, I'm generally available lmk when would like to talk next and finalize." The parties met for lunch at their synagogue on August 20, 2021. On August 23, 2021, Aharonoff wrote, "Hi Amnon. Ready to start today?" and Edri began transferring funds. On August 25, 2021, Aharonoff wrote: "Please reply to the email saying you understand and agree to all terms so can have that step finalized too," and Edri answered, "Ok."

38. Edri had no experience with cryptocurrency or DeFi applications, and Aharonoff knew it. Aharonoff supervised every step of Edri's onboarding: he walked Edri through the Dharma application's payment settings by voice message and screenshot; he drafted the message Edri was to send to Dharma's support desk about a delayed wire and then emailed Dharma himself on Edri's behalf; and he told Edri,

"[O]nce it arrives lmk so we can meet at Moorpark. It'll take me few minutes to make some moves in Dharma."

**D. Aharonoff Selects ETH2x-FLI and Directs the Purchases**

39. Aharonoff alone chose the product. On September 9, 2021, after Edri's $50,000 wire reached Dharma, Aharonoff instructed: "So final step for now is to buy using your usdc the eth2x fli." Moments later he added: "Make 2 purchases at 25k each time."

40. The same morning, Edri observed that the position "took a hit" over the Rosh Hashanah holiday. Aharonoff answered, "Irrelevant," and pressed him on: "Let's continue to load up per the plan to gain at least 500k exposure. Today is a nice buy of the dip."

41. Between August 25 and September 9, 2021, Edri purchased approximately 602.81 ETH2x-FLI tokens through the Dharma application in four orders—on August 25, on September 1, and twice on September 9—and the tokens were delivered to his Dharma wallet by September 15, 2021. Those purchases were funded by $101,191.23 that Edri transferred to Dharma Labs, Inc. between August 30 and September 13, 2021: a $50,000 wire from Edri's account at First Republic Bank on August 30; $25,291.89 from the Trust's savings account at Wells Fargo on August 30; $25,250.73 from the Trust's account on September 3; and $648.61 from the Trust's account on September 13.

42. Aharonoff monitored Edri's account from the outset. On September 3, 2021, he reported to Edri: "You are nearly at 70k this morning. 40% in one week and moving."

43. Through October 2021, Aharonoff pressed Edri to commit substantially more money. On October 13, he wrote: "Hanford closing good timing for your next ride with me. Get ready for a rocketship ride," and "Could repeat Hanford 2 years return in 2 months!" On October 20: "Wire rcvd. Moving 400k into Dharma? today is a good day as things are starting to move." On October 21: "Small dip today. You moving in wire

today?" On October 22: "Alo? Making move today?" On October 23: "Don't want you to miss things. Aiming to move in come Monday?"

44. On October 20, 2021, Aharonoff told Edri that, for the larger purchase, "I'll have you send to a new wallet so I can make the purchase which is like 90% less direct on the blockchain and no 3% fee."

45. On October 24, 2021, when Edri sent Aharonoff a screenshot concerning a different digital asset, Aharonoff replied: "Not true. It's not liquid. Plus I don't invest in casino coins it's for people looking to gamble like a lotto ticket."

46. On October 25, 2021, Edri told Aharonoff, "Wire sent." On October 26, 2021, $175,000 was wired from the Trust's Wells Fargo savings account, through Silvergate Bank, to Dharma Labs, Inc. The funds were credited to Edri's Dharma wallet as 175,000 USDC, a dollar-pegged stablecoin, on November 3, 2021.

47. On November 2, 2021, while the wire was pending, Edri asked Aharonoff whether he should sell: "I'm considering selling on dharma taking out my money and moving everything to coin-base"; "What do you think?"; and "How do I close position or sale?" Aharonoff answered: "I wouldn't suggest that. You don't need to sell just move between accounts." He told Edri to "setup your coinbase account and wire 100k to have it ready and all connected," and added: "If I'm right we'll see a 100% return by Thanksgiving again though that's still just the very beginning so..."

48. On November 3, 2021, Aharonoff wrote: "Try buying fli again this morning? Coinbase 200k ready?" At 12:20 p.m. that day he wrote: "Amnon. Buy fli today, things are moving!"

49. On the morning of November 4, 2021, Edri asked, "What's the symbol to buy?" Aharonoff answered: "Eth2x-fli." When Edri sent a screenshot of an error message, Aharonoff coached him through the order—"Try again for 50k get same error?"—and then sent Edri the address of a digital wallet that Aharonoff controlled, 0x16cb8AB160BC1fc1BADCA4D5EfE60f01163590D2. At approximately 8:47 a.m. Pacific time, Edri swapped the entire 175,000 USDC for approximately 734.83 ETH2x-

FLI tokens, at approximately $238.15 per token. Ethereum traded at approximately $4,603 that day, within days of its then all-time high. On November 5, 2021, a further $891.52 was transferred from the Trust's savings account to Dharma Labs, Inc.

50. In November 2021, at Aharonoff's direction—"Coinbase funded?"; "Market keeps moving"; "Want you to get in"; "200k in? Today is a nice dip to to buy on"; "The sooner you build to a 500k position the better"—Edri deposited $60,000 into an account at Coinbase from his personal checking account at Wells Fargo: $1,000 on November 4, $25,000 on November 12, and $34,000 on November 19, 2021. Edri used the deposited funds to buy approximately 13.28 ETH. On December 13, 2021, Aharonoff asked, "Are you send the coinbase funds so I can secure that swap? Today is a great day," and sent his wallet address again: "This is where to send coinbase ETH too."

51. On November 17, 2021, Edri reported that his balance had shrunk by $100,000. Aharonoff replied: "Buying the dip is a matana"; "I can only advise you"; "The sooner you build to a 500k position the better"; "You can't buy fli on Coinbase"; "Instead I'll do it directly on the blockchain for you"; and "Adding to your position has no brainer 40% gain in short period. Think of it as a chanuka gift." The next day he wrote: "Amnon. Ready to move it's a nice 2nd chance dip for you."

52. Aharonoff could see Edri's holdings in the Dharma application and reported them to him. On November 30, 2021, he wrote: "I also don't think I see the increased buy you mentioned on dharma. Still see around 1,300 fli." On December 1: "Confirmed xfers didn't take and 265 is in?" On December 6: "Pretty sure your at 265." On January 4, 2022: "Also from what I can see your dharma position is the same as a month ago with your 260k in. Last we spoke you should reconcile with your bank and if you do they you'll likely see several wires never went through. I need to know exactly for my records so plmk what you intend to do."

53. On December 6, 2021, Aharonoff wrote: "Confirming bank info we should get going to secure your position as things are possible going to start to get wild." On December 13, 2021, Edri sent Aharonoff a screenshot of the Dharma application's

network-selection screen for a purchase of approximately 146.31 ETH2x-FLI tokens at a total cost of $24,318.64 and asked, "Which to choose?" Aharonoff answered: "Ethereum." On December 14, 2021, Edri transferred a further $24,266.63 from the Trust's savings account to Dharma Labs, Inc., and on December 18, 2021, he received approximately 146.14 ETH2x-FLI tokens through the Dharma application.

54. On January 11, 2022, Edri asked Aharonoff: "Are you saying we need to say shalom to our money?" Aharonoff replied: "No. I'm kinda of repeating the same conversation. Add more get to 500k."; "Or just hold this is par for the course and as I've told you as well volatility is also expected and normal."; "I've increased my position, so I'm not giving you advise I'm. It myself taking."; "Remember it's a long term not short term trade"; "For example tmw CPI number comes out if could cause another major dump down or spike up."; and "However either way is irrelevant on the long time horizon. Since it going up 3x isn't an exit strategy." When Edri said he was "thinking to increase," Aharonoff answered: "Thinking costs money."

55. On January 18, 2022, Aharonoff told Edri that "Dharma has been sold and their app will stop working in a few weeks," that Edri needed "to move all tokens in dharma to your Coinbase wallet to hold there," and: "Call me and I'll show you how to move it out to another wallet." On the morning of January 19, 2022, Aharonoff sent Edri his home address and told him to "[p]ull into the driveway."

56. At Aharonoff's home on January 19, 2022, within approximately half an hour of his arrival and on Aharonoff's instructions, Edri (a) transferred his entire Dharma balance of approximately 1,483.78 ETH2x-FLI tokens to a new wallet, 0xF0cbBC7C87fBe3B64d596578E989E7cF0D557BE6 (the "Wallet"), at approximately 10:05 a.m.; (b) moved approximately 13.28 ETH, then worth approximately $42,000, from his Coinbase account into the Wallet at approximately 10:18 a.m.; and (c) swapped 13.0 ETH for approximately 387.30 ETH2x-FLI tokens at approximately 10:22 a.m.

57. In total, the $361,349.38 that Edri transferred at Aharonoff's direction between August 30 and December 14, 2021 became approximately 1,871.08 ETH2x-FLI tokens. Those tokens have remained in the Wallet, untouched, since January 19, 2022. More than two-thirds of them were bought within ten weeks of Ethereum's November 2021 peak.

58. On February 24, 2022, Edri asked Aharonoff, "What's the strategy? Double up or wait more." Aharonoff answered "100%" and "Now time to add," and added: "However there are some new protocols I'll move you into. How much are you able to add?" When Edri answered "100k," Aharonoff wrote: "Ok wire into Coinbase and lmk once there and I'll call you to explain this new move given where the market is." On March 8, 2022, Edri deposited $20,000 into his Coinbase account from his personal checking account.

59. Edri carried out each of the transactions described above himself, on accounts in his own name and the Trust's name, step by step as Aharonoff instructed. Aharonoff repeatedly offered to execute the trades himself through a wallet that he controlled: he sent Edri the address of that wallet on November 4, November 23, and December 13, 2021, and wrote, "Once ready I'll send you a wallet to send to and I'll transact the buys directly on the Blockchain," and, "Instead I'll do it directly on the blockchain for you."

**E. ETH2x-FLI**

60. ETH2x-FLI, the "Ethereum 2x Flexible Leverage Index," is a digital token on the Ethereum blockchain. On information and belief, it was issued through the Set Protocol and was created, managed, and marketed by a decentralized organization known as Index Coop. It is designed to deliver approximately twice the daily price movement of Ethereum. It does so by depositing its holders' pooled Ethereum collateral into a lending protocol, borrowing dollar-pegged stablecoins against that collateral, using the borrowed stablecoins to buy more Ethereum, and repeating the loop until a target leverage ratio of two-to-one is reached.

61. To hold the ratio at two-to-one, the token rebalances automatically. When Ethereum falls, the leverage ratio rises and the protocol sells Ethereum collateral at depressed prices to repay debt. When Ethereum rises, the protocol borrows more to buy Ethereum at elevated prices. In a falling, sideways, or volatile market, this mechanism sells low and buys high, and the token's value decays relative to Ethereum's. The developers of the token refer to this phenomenon as volatility drift or volatility decay.

62. The developers of ETH2x-FLI warned of these risks publicly. On June 11, 2021, before Edri's first purchase, Index Coop published an article explaining that "FLI becomes a riskier asset to hold over time" and that "[h]olding a FLI product over an extended period of time may yield great returns, but it is a very high risk strategy." In March 2024, when Index Coop replaced ETH2x-FLI with a successor token, its published frequently-asked-questions page stated that its new leverage tokens "are not intended to be held for extended periods of time" and recommended "that holders manage their positions in daily or weekly terms, not monthly or yearly terms."

63. Between November 2021 and mid-2022, the price of Ethereum fell from approximately $4,600 to below $1,000. Over the same period, the price of ETH2x-FLI fell by a factor of approximately 29.

64. Ethereum has since recovered fully. In late August 2025, Ethereum set a new all-time high above $4,900, higher than its price on the day of every one of Edri's purchases. ETH2x-FLI did not recover. On those days it traded at approximately $22 to $23 per token, and Edri's approximately 1,871.08 tokens were worth approximately $42,000, roughly 90% less than he had paid for them.

65. ETH2x-FLI is thinly traded. On information and belief, market-wide daily trading volume in the token is often a few thousand dollars and on many days is zero. In 2024, Index Coop replaced the product with a new token, "ETH2x," leaving the legacy ETH2x-FLI token as a wrapper that holders must unwrap to exit. Edri's tokens alone represent approximately 0.33% of the entire supply of ETH2x-FLI.

66. ETH2x-FLI is a security within the meaning of Section 3(a)(10) of the Exchange Act, 15 U.S.C. § 78c(a)(10), and California Corporations Code section 25019, because it is an investment contract.

67. Purchasers of ETH2x-FLI invest money in a common enterprise. On information and belief, the Ethereum collateral contributed by all holders is pooled in a single on-chain vehicle (a "Set"), and the vehicle's assets and debt are shared pro rata by every holder, so that the fortunes of all holders rise and fall together with the performance of the pooled, leveraged position.

68. Purchasers of ETH2x-FLI expect profits. The token is marketed as an index product that delivers a leveraged return on Ethereum and has no consumptive use.

69. Those expected profits depend on the essential managerial efforts of others. On information and belief, Index Coop designed the leverage methodology, sets and adjusts the rebalancing parameters, executes or causes to be executed the rebalancing transactions, upgrades and migrates the product (as it did in 2024), and collects a percentage of holders' assets each year as a fee for that management. Without Index Coop's continued management of the leveraged position, the token would have no function or value.

70. ETH2x-FLI is unlike Ethereum itself, which trades on a decentralized network and has been treated by federal regulators as a commodity. ETH2x-FLI is a derivative product layered on top of Ethereum whose value depends on a third party's management of borrowed money.

71. Aharonoff understood the product. He held himself out as an expert in Ethereum and DeFi; the token's leverage is stated in its name and in its developers' published materials; he told Edri that he had "increased my position" in the same token; he monitored and reported Edri's balances in it; and he acknowledged in the Deck that digital assets of this kind could be reclassified as securities.

**F. Aharonoff's Misrepresentations and Omissions**

72. The word "leverage" does not appear in the Terms or anywhere in Aharonoff's written communications with Edri from August 2021 through 2026. Nor do the words "leveraged," "margin," "borrow," "rebalance," or "decay." The only reference to "2x" in the entire record of those communications is the ticker symbol itself.

73. Aharonoff first used the word "volatility" in a message to Edri on January 11, 2022, after all but the last of Edri's purchases, and then only to tell Edri that volatility was "expected and normal" and that a "major dump down" would be "irrelevant on the long time horizon."

74. In soliciting and directing Edri's purchases of ETH2x-FLI, Aharonoff made the following false and misleading statements and omissions, each by email or WhatsApp message to Edri on the date stated.

75. On August 13, 2021, by email, Aharonoff represented that "[a]ll strategies I apply will provide liquidity in order to exit to cash at any time" and that "[n]o strategies will lock any funds long terms." Those statements described the present character of the strategies Aharonoff intended to apply. They were false and misleading when made because the one strategy Aharonoff applied was to place all of Edri's funds in a single leveraged token that, by its design, could be held only briefly without decaying, that Aharonoff intended and instructed Edri to hold indefinitely, and that is now effectively illiquid.

76. On August 13, 2021, by email, Aharonoff represented that the risks of the investment were "outcomes that are out of my control such as market timing, world catastrophe, unforeseen changes, 3rd party risk, hacks, etc.," and that "the upside outweighs the downside." Having undertaken to describe the risks, Aharonoff omitted the structural risk that was certain to operate in any volatile market: that the product he had selected was leveraged two-to-one, rebalanced daily, decayed in value with volatility, and, in its own developers' words, became "a riskier asset to hold over time." The partial description of risk was misleading without that disclosure.

77. On September 9, 2021, by WhatsApp message, Aharonoff instructed Edri to "buy using your usdc the eth2x fli" and to "Make 2 purchases at 25k each time," dismissed the holiday drawdown as "Irrelevant," and told Edri that "Today is a nice buy of the dip." Those statements recommended a product without disclosing its leveraged and decaying nature and were misleading because, for a daily-rebalancing leveraged token, drawdowns are not irrelevant: each one permanently sells collateral at depressed prices.

78. On October 24, 2021, by WhatsApp message, Aharonoff told Edri, "I don't invest in casino coins it's for people looking to gamble like a lotto ticket." The statement represented that the strategy in which Aharonoff had placed Edri was not speculative. It was false and misleading when made because holding a two-to-one leveraged, daily-rebalancing token over an extended period, as Aharonoff intended, is, by its developers' own description, "a very high risk strategy."

79. On November 2, 2021, by WhatsApp message, in response to Edri's question about how to "close position or sale," Aharonoff told Edri, "I wouldn't suggest that. You don't need to sell," and, "If I'm right we'll see a 100% return by Thanksgiving." Those statements were misleading because Aharonoff advised against exit without disclosing that the timing of any exit was critical for the product he had chosen, and because the forecast had no reasonable basis and was made while the risk that made it reckless was concealed.

80. On November 3 and 4, 2021, by WhatsApp message, Aharonoff instructed Edri to "Buy fli today, things are moving!" identified the ticker "Eth2x-fli," and coached Edri through the $175,000 order ("Try again for 50k get same error?"). Those statements and instructions were misleading because they were made without disclosing the leverage, the rebalancing decay, or the developers' holding-period warning, at the moment Edri was committing the largest single sum at issue.

81. On November 17 and 18, 2021, by WhatsApp message, Aharonoff told Edri that "Buying the dip is a matana," that "Adding to your position has no brainer 40% gain

in short period," and that it was "a nice 2nd chance dip for you." Those statements were false and misleading because there was no reasonable basis to describe any gain as a "no brainer," and because, for the product at issue, each "dip" permanently destroyed collateral through forced rebalancing, which Aharonoff concealed. On December 6, 2021, by WhatsApp message, Aharonoff told Edri that "we should get going to secure your position as things are possible going to start to get wild." On December 13, 2021, by WhatsApp message, when Edri sent him the Dharma order screen for a purchase of approximately 146 more tokens and asked, "Which to choose?" Aharonoff answered, "Ethereum," and then pressed Edri to send his Coinbase funds "so I can secure that swap," because "[t]oday is a great day." Those statements and instructions were misleading because they were made without disclosing the leverage, the rebalancing decay, or the developers' holding-period warning, as Edri was enlarging his position through the purchases of December 2021 and January 19, 2022.

82. On January 11, 2022, by WhatsApp message, eight days before Edri's final purchase, Aharonoff told Edri to "just hold this is par for the course," that "volatility is also expected and normal," that the position was "a long term not short term trade," and that a further drop would be "irrelevant on the long time horizon." Each statement was false and misleading when made because the value of the product Aharonoff had chosen is destroyed by volatility, and because its developers had warned that holding it over an extended period was "a very high risk strategy."

83. Throughout the period from August 7, 2021 through January 19, 2022, in every communication in which he recommended, sized, timed, or coached a purchase of ETH2x-FLI, Aharonoff omitted to disclose the following material facts: (a) that ETH2x-FLI is a leveraged derivative token that rebalances daily; (b) that the token loses value in sideways and volatile markets through forced rebalancing, whether or not Ethereum recovers; (c) that the token's developers had warned that holding it over an extended period was "a very high risk strategy" and that it was better used "to target short term price movements"; (d) that Aharonoff's compensation rewarded him for maximizing the

capital Edri deployed while he bore no share of any loss; and (e) that Aharonoff was not licensed or registered to provide investment advice or to effect securities transactions.

84. Aharonoff had a duty to disclose those facts. He had undertaken, in writing, to manage Edri's investment and to advise him for a share of the profits; he knew that Edri had no experience with digital assets and was relying on him entirely; he had required Edri not to consult anyone else; and, having chosen to describe the strategy's liquidity and risks, he was obliged to describe them completely.

85. Aharonoff knew that the statements described above were false and misleading when made, or made them with deliberate recklessness. He held himself out as an expert in Ethereum and DeFi. The product's leverage is stated in its name and in its developers' published materials, which Aharonoff, as a self-described expert who traded the token himself, read or recklessly disregarded. His own Deck acknowledged the regulatory character of such assets. His compensation depended on Edri deploying as much capital as possible. And in April 2026 he denied having had any access to Edri's account, denied having had anything to gain, and claimed to have warned Edri "from day one" of the risks—each of which his own 2021 writings contradict. Either Aharonoff understood the token's mechanics in 2021 and concealed them, or he directed a novice to place more than $360,000 in a leveraged derivative without understanding it. Either alternative constitutes the requisite scienter.

86. The omitted facts were material. A reasonable investor deciding whether to place his savings in a token for a multi-year hold would consider it important that the token was leveraged two-to-one, rebalanced daily, decayed in volatile markets, and, in its own developers' words, became "a riskier asset to hold over time."

87. Edri relied on Aharonoff's statements and on his silence. Edri had no independent knowledge of DeFi or of leveraged tokens, had agreed not to discuss the strategy with anyone else, and bought what, when, and in the amounts that Aharonoff told him to buy. Had Edri known the omitted facts, he would not have purchased ETH2x-FLI.

88. Edri also would have sold. He asked Aharonoff how to close the position on November 2, 2021, and was told not to. He asked on January 11, 2022 whether "we need to say shalom to our money" and was told to "just hold" and to add. On May 31, 2022, when Edri asked for updates on "Ethereum and the crypto market in general," Aharonoff told him that his "[c]onsistent message is to accumulate more of the specific protocol and depending on amount I will want to position you differently," that "this represents a good opportunity to buy at a discount," and that "this is generational wealth, high risk, long time horizon." When Edri answered that he was "thinking to wait more before increasing my holdings," Aharonoff replied: "Point is it's like 80% down so in my mind that's great entry." On March 8, 2024, Aharonoff wrote, "I hope you did what we discussed as the ride continues." On June 3, 2024, Aharonoff told him, "right now stay in position the etf is next big step since approval." On each occasion, had Aharonoff disclosed the true nature of the product, Edri would have sold his tokens.

89. Aharonoff's secrecy requirement prevented Edri from obtaining independent, licensed advice that would have identified the nature of the product. Edri complied with it and did not consult any financial adviser, broker, or accountant about the position until years later.

**G. Aharonoff Keeps Edri in the Position and Denies His Role**

90. In May 2024, Edri asked Aharonoff to meet, including with another of Aharonoff's investors who, Edri told him, "keeps asking me to meet all 3 of us." Aharonoff refused: "No. Remember the meeting thing I'm not into." On June 3, 2024, he told Edri: "right now stay in position the etf is next big step since approval."

91. Edri accepted those assurances, as he had accepted every assurance before them. He is a contractor, not a financial professional; he had agreed not to discuss the strategy with anyone else; and he relied on Aharonoff, who held himself out as an expert, had undertaken in writing to manage the investment, and answered every expression of concern with an assurance that the loss was "irrelevant," "par for the course," or

"expected and normal," or that the dip was a "great entry." Edri did not investigate the product, consult anyone else about it, or question his adviser's honesty.

92. Nor did the market tell Edri what Aharonoff had not. Between November 2021 and mid-2022, Ethereum itself fell by roughly three-quarters, and Edri understood the decline in his position to be the decline of the market, as Aharonoff's messages encouraged him to believe. What distinguished the token from the market—its failure to recover when Ethereum recovered—did not become observable until Ethereum returned to and exceeded its 2021 levels in 2025 and Edri's position did not.

93. In or around March 2026, Edri learned for the first time, from another investor to whom Aharonoff had recommended the same token, that ETH2x-FLI was a leveraged token that rebalanced daily and lost value in a volatile market whether or not Ethereum recovered, that it was not a product to be held for the long term, and that Aharonoff's statements about liquidity, risk, and holding period had been false. Before then, Edri had no reason to suspect any of those facts and, in the exercise of reasonable diligence, could not have discovered them.

94. On April 21, 2026, when Edri asked to meet "[a]bout the investment you put me through," Aharonoff wrote: "You have full control and I have no access"; "As I've maintained from day one risk is high, volatile etc."; and "I gave you friendly advise which I've given many friends and family and I have nothing to gain as you know." Each statement was contradicted by his own Terms—"I'll log into your account and manage that"; "[b]oth of us will have access to the wallet"; "the upside outweighs the downside"; "a quarterly 25% performance fee"—and by his monitoring and reporting of Edri's balances in 2021 and 2022.

95. On July 22, 2026, Edri wrote to Aharonoff: "if you wish to solve this in a nice way please contact me to discuss options" and "I always prefer to get things done peacefully." Aharonoff's reply was an automated message directing Edri to continue the conversation with "DigitalDan," an "evolving digital twin" that Aharonoff said he had built "[t]o scale my time."

96. On October 2, 2026, Edri, through counsel, demanded rescission of the investment and return of his funds. Aharonoff, through counsel, has denied all liability.

**H. Edri's Losses**

97. Edri's approximately 1,871.08 ETH2x-FLI tokens, purchased for $361,349.38, are worth less than $10,000 at any available market quotation. Edri has lost approximately $354,000, or approximately 98% of the money he invested.

98. Edri's loss was caused by the undisclosed leverage and rebalancing decay of ETH2x-FLI, not by the market. Ethereum's price at its August 2025 high exceeded its price on the day of every one of Edri's purchases. Had the same dollars simply been used to buy Ethereum, Edri would hold approximately 92 ETH, worth approximately $160,000 today, and that holding would recover with every dollar Ethereum gains. The leveraged token cannot.

99. Edri has been damaged in an amount to be proven at trial and not less than $361,349.38, together with the $20,000 that he deposited at Aharonoff's direction in March 2022, according to proof, and prejudgment interest from the date of each transfer.

100. Had Edri's funds been invested as a prudent adviser would have invested them between August 2021 and January 2022, they would have grown rather than been lost. The same dollars invested in a fund tracking the S&P 500 index on the dates of Edri's transfers would have been worth approximately $545,000 at the close of trading on November 20, 2026. Edri seeks that measure of damages in the alternative on his claims for breach of fiduciary duty and fraud.

**FIRST CAUSE OF ACTION**

**(Breach of Fiduciary Duty)**

**(Against Aharonoff)**

101. Edri realleges and incorporates by reference paragraphs 1 through 100 above.

102. Aharonoff owed Edri fiduciary duties as his investment adviser and agent. Under the Terms, Aharonoff undertook, for a share of the profits, to select and apply

investment strategies for Edri's funds, to log into Edri's account and manage it, and to advise Edri on the acquisition and disposition of digital assets. He thereafter did select the product, set the size and timing of every purchase, coach the execution of the purchases, monitor the account, and advise Edri whether to hold, sell, or add.

103. Independently, a confidential relationship existed between Edri and Aharonoff. Edri, who had no experience with digital assets, reposed trust and confidence in Aharonoff, a long-time friend who held himself out as an expert investor; Aharonoff knew of and accepted that trust, required Edri to keep the strategy secret from everyone else, and told Edri that "I can only advise you" and that "what I discussed with you only comes with hashems blessings."

104. As a fiduciary, Aharonoff owed Edri duties of utmost good faith, loyalty, and care, including the duties to disclose fully all facts material to the investment, to recommend only investments suitable for Edri's circumstances and stated objectives, to disclose and avoid conflicts of interest, to manage the investment with reasonable care, and to refrain from acting for his own benefit at Edri's expense.

105. Aharonoff breached those duties by, among other things:

(a) selecting an unsuitable, short-term leveraged derivative for an inexperienced client whom he told to hold for the long term, and directing the client to concentrate 100% of his funds in it;

(b) failing to disclose that the product was leveraged, rebalanced daily, decayed in volatile markets, and, in its own developers' words, became "a riskier asset to hold over time";

(c) creating, and failing to disclose, a conflict of interest under which he would receive 25% of any profits on the capital he persuaded Edri to deploy while bearing no share of any loss;

(d) dismissing each of Edri's concerns about timing and risk as "irrelevant" and pressing him to add to the position;

(e) on each of the occasions in January 2022, May 2022, March 2024, and June 2024 on which Edri raised the position with him, instructing Edri to hold and to add to it when any prudent adviser would have advised him to exit;

(f) abandoning the position—applying no strategy, taking no profit, managing no risk, and setting no exit—after promising liquidity and active management; and

(g) disclaiming the relationship and his role in April 2026 in order to avoid responsibility for its consequences.

106. As a direct and proximate result of those breaches, Edri suffered the losses alleged in paragraphs 97 through 100 above. Edri is entitled to recover all damages proximately caused by the breaches, including, in the alternative, the amount his funds would have earned under prudent management.

107. Aharonoff's conduct was fraudulent, oppressive, and malicious within the meaning of California Civil Code section 3294. He concealed a known, structural risk from a trusting friend in order to earn a share of profits on capital he persuaded that friend to deploy, and he continued to conceal it for years while the friend's savings decayed. Edri is entitled to punitive and exemplary damages in an amount sufficient to punish and deter.

**SECOND CAUSE OF ACTION**

**(Fraud and Deceit—Intentional Misrepresentation and Concealment, Cal. Civ. Code §§ 1572, 1709, 1710)**

**(Against Aharonoff)**

108. Edri realleges and incorporates by reference paragraphs 1 through 100 above.

109. Aharonoff made the intentional misrepresentations of fact alleged in paragraphs 75, 76, 78, 79, 81, and 82 above. His forecasts of a "100% return by Thanksgiving" and a "no brainer 40% gain" were representations of fact in the circumstances in which they were made, because Aharonoff held himself out as an expert

with special knowledge of the product, made them to a client who relied on that expertise, and made them without any reasonable basis and while concealing the mechanism that made them reckless.

110. Aharonoff also concealed and suppressed the material facts alleged in paragraph 83 above. He had a duty to disclose those facts because he was Edri's fiduciary; because he had exclusive knowledge of them, which Edri could not reasonably have discovered; because he actively concealed them by assuring Edri that each drawdown was irrelevant and normal; and because he made partial representations about the strategy's liquidity and risks while suppressing the facts that made those representations misleading.

111. Aharonoff knew that his representations were false when made and knew of the facts he concealed, or made the representations recklessly and without regard for their truth, as alleged in paragraph 85 above.

112. Aharonoff made the representations and concealed the facts with the intent to induce Edri to transfer funds to the platforms Aharonoff designated, to purchase ETH2x-FLI, to enlarge the position, and to hold it, so that Aharonoff would earn a share of any profits.

113. Edri justifiably relied on the representations and on the absence of the concealed facts in purchasing ETH2x-FLI, in enlarging the position, and in refraining from selling it, as alleged in paragraphs 87 through 89 above. Had the concealed facts been disclosed, Edri would not have purchased the tokens and would have sold them at each of the times alleged in paragraph 88 above.

114. As a direct and proximate result, Edri suffered the damages alleged in paragraphs 97 through 100 above. Because Aharonoff was Edri's fiduciary, Edri is entitled to recover all detriment proximately caused by the fraud, including the amount his funds would have earned under prudent management, in the alternative to his out-of-pocket loss.

115. Aharonoff's fraud was intentional and malicious, and Edri is entitled to punitive and exemplary damages under California Civil Code section 3294.

**THIRD CAUSE OF ACTION**

**(Constructive Fraud, Cal. Civ. Code § 1573)**

**(Against Aharonoff)**

116. Edri realleges and incorporates by reference paragraphs 1 through 100 above.

117. A fiduciary and confidential relationship existed between Edri and Aharonoff, as alleged in paragraphs 102 and 103 above.

118. In breach of the duties arising from that relationship, Aharonoff failed to disclose the material facts alleged in paragraph 83 above and made the misleading statements alleged in paragraphs 75 through 82 above, and thereby gained an advantage over Edri and misled him to his prejudice, whether or not Aharonoff intended to deceive.

119. Edri relied on Aharonoff's statements and on his silence, as alleged in paragraphs 87 through 89 above.

120. As a direct and proximate result, Edri suffered the damages alleged in paragraphs 97 through 100 above, and is entitled to punitive and exemplary damages under California Civil Code section 3294.

**FOURTH CAUSE OF ACTION**

**(Negligent Misrepresentation, Cal. Civ. Code §§ 1709, 1710(2))**

**(Against Aharonoff)**

121. Edri realleges and incorporates by reference paragraphs 1 through 100 above.

122. In the alternative to the Second Cause of Action, Aharonoff made positive assertions of existing fact that were not true, including the assertions alleged in paragraphs 75, 76, 78, and 82 above: that all strategies he applied would provide liquidity to exit to cash at any time; that no strategy would lock funds long term; that the risks of the investment were limited to matters outside his control such as market timing and

hacks; that the strategy was not a gamble; and that volatility in the position was "expected and normal" and "par for the course."

123. Aharonoff had no reasonable ground for believing those assertions to be true when he made them, for the reasons alleged in paragraphs 60 through 71 above.

124. Aharonoff made the assertions with the intent to induce Edri to rely on them by transferring funds, purchasing ETH2x-FLI, enlarging the position, and holding it.

125. Edri justifiably relied on the assertions, as alleged in paragraphs 87 through 89 above, and was ignorant of their falsity.

126. As a direct and proximate result, Edri suffered the damages alleged in paragraphs 97 through 99 above.

**FIFTH CAUSE OF ACTION**

**(Violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5)**

**(Against Aharonoff)**

127. Edri realleges and incorporates by reference paragraphs 1 through 100 above.

128. ETH2x-FLI is a security for the reasons alleged in paragraphs 66 through 70 above.

129. This claim is based on Edri's purchases of ETH2x-FLI in December 2021 and January 2022, alleged in paragraphs 53 and 56 above (together, the "Purchases").

130. In connection with each of the Purchases, Aharonoff, directly and indirectly, used the means and instrumentalities of interstate commerce described in paragraph 18 above.

131. In connection with the Purchases, Aharonoff made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, as alleged in paragraphs 75 through 83 above. Each statement is identified there by date, medium, and content, together with the reasons it was false or misleading when made.

132. Aharonoff's conduct, taken as a whole—soliciting an inexperienced investor under terms promising liquidity, directing him into a leveraged derivative whose nature was concealed, pressing him to enlarge the position, and instructing him to hold it—also constituted a device, scheme, or artifice to defraud and an act, practice, or course of business that operated as a fraud or deceit upon Edri in connection with the Purchases.

133. Aharonoff had a duty to disclose the omitted facts, as alleged in paragraph 84 above, by reason of the relationship of trust and confidence between the parties, his undertaking to manage and advise on Edri's investment for compensation, and his partial statements concerning the strategy's liquidity and risks.

134. Aharonoff acted with scienter, as alleged in paragraph 85 above. He knew that his statements were false and misleading and that the omitted facts were material, or he was deliberately reckless in not knowing.

135. The misrepresented and omitted facts were material, as alleged in paragraph 86 above.

136. Edri actually relied on Aharonoff's statements and instructions in making each of the Purchases, as alleged in paragraph 87 above. With respect to the omitted facts, reliance is presumed because Aharonoff had a duty to disclose them and failed to do so.

137. Each misrepresentation and omission was made in connection with the purchase of a security: Aharonoff recommended, sized, and timed each Purchase, and his statements and instructions, including those of December 6 and 13, 2021, and January 11, 18, and 19, 2022, were made for the purpose of inducing the Purchases and coaching their execution.

138. Edri suffered economic loss, and Aharonoff's misrepresentations and omissions proximately caused that loss, as alleged in paragraphs 97 and 98 above. The concealed leverage and rebalancing decay, not the general movement of the market, caused the tokens purchased in the Purchases to lose nearly all of their value and to fail to recover when Ethereum recovered.

139. As a direct and proximate result, Edri has been damaged in an amount to be proven at trial, including the difference between the amounts paid in the Purchases and the value of the tokens received, or, in the alternative and because Aharonoff stood in a relationship of trust and induced the Purchases, rescissory damages, together with prejudgment interest.

**SIXTH CAUSE OF ACTION**

**(Rescission Under Section 29(b) of the Exchange Act, 15 U.S.C. § 78cc(b), for Violation of Section 15(a), 15 U.S.C. § 78o(a))**

**(Against Aharonoff)**

140. Edri realleges and incorporates by reference paragraphs 1 through 100 above.

141. The Terms constitute a contract between Edri and Aharonoff under which Aharonoff undertook, for compensation contingent on the money Edri deployed and the profits generated, to select, size, and time transactions in securities for Edri's account, to "log into your account and manage that," and to move funds between wallets "to complete a transaction."

142. In performing the Terms, Aharonoff acted as a broker within the meaning of Section 3(a)(4)(A) of the Exchange Act, 15 U.S.C. § 78c(a)(4)(A): he engaged in the business of effecting transactions in securities for the accounts of others. Among other things, Aharonoff:

(a) actively solicited Edri and other investors to purchase securities, as alleged in paragraphs 25, 28, 29, 43, 48, and 50 above;

(b) arranged to receive compensation contingent on the money deployed and the profits generated in the transactions he solicited, as alleged in paragraph 34 above, and offered other investors a "GP/LP Split" of profits, as alleged in paragraph 23 above;

(c) undertook in writing to log into Edri's account, to manage it, and to move Edri's funds between wallets to complete transactions, and repeatedly

offered to receive Edri's funds in a wallet Aharonoff controlled in order to execute purchases himself, as alleged in paragraphs 31, 44, 51, and 59 above;

(d) participated in the placement of orders, including by specifying the product, the number and size of purchases, the ticker symbol, and the timing of each purchase, and by coaching Edri through the execution of the $175,000 order on November 4, 2021 and the January 19, 2022 transactions at his home, as alleged in paragraphs 39, 49, and 56 above;

(e) offered securities of other issuers, including limited-partnership interests in Alef 10X LLC, and told Edri that "there are some new protocols I'll move you into" and that "depending on amount I will want to position you differently," as alleged in paragraphs 23, 58, and 88 above;

(f) gave advice and valuations concerning the merits of the investment, as alleged in paragraphs 40, 42, 47, 51, and 54 above; and

(g) did so with regularity, for multiple investors, as part of a business with a stated goal of $10 million under management, as alleged in paragraphs 22 through 27 above.

143. Aharonoff was not registered with the SEC as a broker or dealer and was not associated with a registered broker-dealer, as alleged in paragraph 11 above, and he made use of the mails and the means and instrumentalities of interstate commerce to effect and to induce the purchase of securities, in violation of Section 15(a)(1) of the Exchange Act, 15 U.S.C. § 78o(a)(1).

144. The Terms were made in violation of the Exchange Act, and their performance involved the violation of Section 15(a). Under Section 29(b) of the Exchange Act, 15 U.S.C. § 78cc(b), the Terms are void as regards the rights of Aharonoff.

145. Edri is a party to the Terms, did not himself violate the Exchange Act, and is within the class of investors that Section 15(a) was enacted to protect. Edri elects to rescind the Terms.

146. Edri is entitled to a declaration that the Terms, including their provisions allocating losses to Edri and requiring secrecy, are void and unenforceable as against him; to rescission of the Terms; to restitution of all consideration and benefits conferred on Aharonoff under the Terms; and to such further relief as is necessary to restore Edri to the position he occupied before the Terms were made.

**SEVENTH CAUSE OF ACTION**

**(Negligence and Negligence Per Se)**

**(Against Aharonoff)**

147. Edri realleges and incorporates by reference paragraphs 1 through 100 above.

148. Having undertaken to act as Edri's investment adviser and to select and direct securities transactions for his account, Aharonoff owed Edri a duty to exercise the care, skill, and diligence of a reasonably prudent investment professional, including the duties to understand the products he recommended, to recommend only suitable investments, to disclose material risks, and to manage the risk of the positions he directed.

149. California Corporations Code sections 25210 and 25230, which require broker-dealers and investment advisers to obtain a certificate from the Commissioner before conducting business in this state; California Corporations Code section 25235, which prohibits investment advisers from engaging in any practice that operates as a fraud or deceit upon a client; and Section 15(a) of the Exchange Act, 15 U.S.C. § 78o(a), were enacted to protect investors such as Edri from the kind of harm that occurred here—unqualified, undisclosed, and conflicted investment advice and brokerage. Aharonoff violated each of those statutes, as alleged above, and his violations give rise to a presumption of negligence under California Evidence Code section 669.

150. Aharonoff breached his duty of care by the conduct alleged in paragraph 105 and its subparagraphs above.

151. As a direct and proximate result, Edri suffered the damages alleged in paragraphs 97 through 99 above.

## EIGHTH CAUSE OF ACTION

**(Breach of Written Contract and of the Implied Covenant of Good Faith and Fair Dealing—Pleaded in the Alternative)**

**(Against Aharonoff)**

152. Edri realleges and incorporates by reference paragraphs 1 through 100 above.

153. This claim is pleaded in the alternative to the Sixth Cause of Action, pursuant to Federal Rule of Civil Procedure 8(d)(2) and (3). To the extent the Terms are not void, they constitute a written contract between Edri and Aharonoff, offered by Aharonoff on August 13, 2021 and accepted by Edri by email on August 15, 2021, by his message of August 25, 2021, and by performance.

154. Edri performed all of his obligations under the Terms, or was excused from performing them. He funded the accounts Aharonoff designated, purchased what Aharonoff told him to purchase, kept the strategy confidential, and stood ready to pay the performance fee.

155. Aharonoff breached the Terms by, among other things: (a) failing to apply strategies that would "provide liquidity in order to exit to cash at any time," and instead placing all of Edri's funds in a product that, by design and by Aharonoff's instructions, locked them in place for years; (b) failing to "manage" Edri's account or to apply any "defi protocol strategies" beyond a single, unmanaged buy-and-hold position; (c) failing to take any of the profit-taking or asset-management steps the Terms contemplated; and (d) continuing, through June 2024, to instruct Edri to hold a decaying asset while disclaiming any responsibility for it.

156. Every contract contains an implied covenant that neither party will do anything to deprive the other of the benefits of the agreement. Aharonoff breached the implied covenant by directing Edri into a product whose nature he concealed, by dismissing Edri's requests to exit, and by abandoning the management he had promised, thereby depriving Edri of the liquidity, transparency, and management for which he had bargained.

157. The provision of the Terms stating that "any losses are fully absorbed by you" does not excuse Aharonoff's breaches. By its terms it applies only to "outcomes that are out of my control"; the selection of the product, the concealment of its nature, the sizing of the position, and the instructions to hold were within Aharonoff's control. To the extent the provision purports to exempt Aharonoff from responsibility for his own fraud, willful injury, or violation of law, it is void under California Civil Code section 1668.

158. As a direct and proximate result of Aharonoff's breaches, Edri suffered damages in an amount to be proven at trial and not less than $361,349.38, together with interest at the legal rate of ten percent per annum from the date of each breach.

**NINTH CAUSE OF ACTION**

**(Unlawful, Unfair, and Fraudulent Business Acts and Practices, Cal. Bus. & Prof. Code § 17200 et seq.)**

**(Against Aharonoff)**

159. Edri realleges and incorporates by reference paragraphs 1 through 100 above.

160. Aharonoff's solicitation of investors, provision of investment advice for compensation, and inducement of securities transactions, as alleged in paragraphs 22 through 27 and 28 through 59 above, constitute business acts and practices within the meaning of California Business and Professions Code section 17200.

161. Those acts and practices are unlawful. They violate California Corporations Code sections 25210, 25230, and 25235, and Sections 10(b) and 15(a) of the Exchange Act, as alleged above.

162. Those acts and practices are fraudulent. The statements and omissions alleged in paragraphs 75 through 83 above were likely to deceive, and did deceive, Edri.

163. Those acts and practices are unfair. Aharonoff solicited an inexperienced investor under a compensation structure that rewarded risk-taking with other people's money while exposing him to none of the loss, combined with a secrecy requirement designed to prevent the investor from obtaining independent advice. The harm to Edri from those practices outweighed any utility they could have had.

164. Edri lost money as a result of Aharonoff's unlawful, unfair, and fraudulent business practices, as alleged in paragraphs 97 through 99 above.

165. Aharonoff continues to hold himself out as a source of investment advice and to offer that advice to "many friends and family" without a certificate from the Commissioner. Unless enjoined, he will continue to do so. Edri has no adequate remedy at law for that continuing conduct, because damages cannot prevent Aharonoff from advising other investors in the same manner. Edri is entitled under California Business and Professions Code section 17203 to an injunction prohibiting Aharonoff from acting as an investment adviser or broker-dealer in California without the certificates required by California Corporations Code sections 25210 and 25230, and from conditioning investment advice on secrecy, and to restitution of any money or property acquired by Aharonoff by means of the practices alleged.

/ /

/ /

/ /

/ /

/ /

/ /

## PRAYER FOR RELIEF

WHEREFORE, Edri prays for judgment against Aharonoff as follows:

1. For compensatory damages in an amount to be proven at trial and not less than $361,349.38, together with such additional sums as are proven, including the $20,000 deposited at Aharonoff's direction in March 2022;
2. In the alternative, on the First, Second, and Third Causes of Action, for damages measured by the value Edri's funds would have had under prudent management, according to proof;
3. For prejudgment interest from the date of each transfer at the legal rate;
4. For punitive and exemplary damages under California Civil Code section 3294 on the First, Second, and Third Causes of Action;
5. For treble damages, costs, and reasonable attorney's fees under California Code of Civil Procedure section 1029.8;
6. On the Fifth Cause of Action, in the alternative, for rescissory damages;
7. On the Sixth Cause of Action, for a declaration that the Terms, including their loss-allocation and secrecy provisions, are void and unenforceable against Edri under 15 U.S.C. § 78cc(b); for rescission of the Terms; and for restitution of all consideration and benefits conferred on Aharonoff under them;
8. On the Ninth Cause of Action, for an injunction prohibiting Aharonoff from acting as an investment adviser or broker-dealer in California without the certificates required by California Corporations Code sections 25210 and 25230, and from conditioning investment advice on secrecy, and for restitution;
9. For costs of suit; and
10. For such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff Amnon Edri, individually and as trustee of The Edri Family Trust, demands a trial by jury on all causes of action and issues so triable, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure and Local Rule 38-1.

Dated: November 23, 2026 UMHOFER, MITCHELL & KING LLP

By: */s/ Matthew Donald Umhofer*
Matthew Donald Umhofer
Adam Snyder

*Attorneys for Plaintiff Amnon Edri, individually and as Trustee of The Edri Family Trust*